IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMGUARD INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| GORDON REES SCULLY MANSUKHANI, LLP | ) | |
| Serve:  Business Filings Incorporated | ) | JURY TRIAL DEMANDED |
| 5661 Telegraph Rd., Ste. 4B | ) | |
| Saint Louis, MO 63129 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JAMES MORRIS, | ) | |
| Serve:  527 Bryan Ave. | ) | |
| St. Louis, MO 63122 | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT FOR LEGAL MALPRACTICE**

COMES NOW Plaintiff, AmGUARD Insurance Company ("AmGUARD"), by and through the undersigned counsel, and for its Complaint against Gordon Rees Scully Mansukhani, LLP ("Gordon Rees") and James Morris ("Morris"), hereby states as follows:

### **INTRODUCTION**

1.     AmGUARD retained the law firm Gordon Rees and its attorney Morris as insurance coverage counsel to provide coverage and claims handling advice and services with respect to claims arising out of an auto accident involving AmGUARD's insured, T&J Enterprises, Inc.

2.     As AmGUARD's coverage counsel, Gordon Rees and Morris had duties to:

a.     Carefully and comprehensively review the claim file provided by AmGUARD;

b.     Perform an investigation of the facts and determine whether there are any further facts that need to be discovered;

#34518152 v1

c. Consider all facts pertaining to the coverage investigation, while not ignoring facts that tend to show coverage or put a conclusion of no coverage in doubt;

d. Consider the interests and expectations of the insured;

e. Be thoroughly versed on Missouri law relating to insurance policy construction, the duties of defense and indemnity, reservation of rights, duties after loss, insurance policy interpretation, the consequences of denial of coverage, the effect of filing declaratory judgment actions seeking a finding of no coverage, RSMo. § 537.065, and bad faith liability;

f. Provide correct and timely legal advice;

g. Become and stay aware of any litigation arising out of the accident;

h. Provide accurate advice regarding reasonably apparent related matters, including legal problems, foreseeable harm, and adverse consequences associated with the advice provided;

i. Not recommend denying coverage for covered claims;

j. Not disclose information obtained from the insured to the claimants.

k. Understand court procedures and discovery practice rules in the jurisdiction where a declaratory judgment action is filed and comply with those rules, as well as have a basic understanding of evidence law;

l. Advise the client if the client (or counsel on behalf of the client) has made a mistake and recommend corrective or remedial action;

m. Provide timely updates to the client and keep the client appraised of developments in all pertinent litigation;

n. Accurately and truthfully communicate with the client;

o. Not conflate issues of insurance coverage with issues of tort liability;

p. Not recommend rejecting a policy limit demand on the basis that coverage does not apply when coverage actually applies;

q. Follow through on recommended courses of action; and

2

r.   Otherwise provide legal services with the degree of skill and diligence ordinarily used under the same or similar circumstances by members of the legal profession.

3.   Morris and Gordon Rees breached all those duties, as they committed acts of professional negligence during their representation of AmGUARD.

4   Further, Morris and Gordon Rees recommended and then carried out improper and bad faith actions that could be imputed to AmGUARD that resulted in AmGUARD ultimately facing eight-figure exposure in potential bad faith liability for denying coverage (multiple times) for a covered claim, and for rejecting (multiple times) the opportunity to resolve the claims against its insured within the policy limits.

5.   Such exposure and other damage suffered by AmGUARD were the proximate result of the acts of professional negligence committed by Morris and Gordon Rees.

### PARTIES, JURISDICTION, and VENUE

6.   AmGUARD is a foreign insurance company incorporated under the laws of the State of Nebraska, with its principal place of business in the State of Pennsylvania, such that it is a corporate citizen of the State of Nebraska and the State of Pennsylvania, and it is authorized to conduct the business of insuring risks in the State of Missouri.

7.   Gordon Rees is a limited liability partnership formed under the laws of the State of California, with its principal place of business in the State of California. Upon information and belief, the partners of Gordon Rees are residents and citizens of the State of California. As such, Gordon Rees is a corporate citizen of the State of California. Gordon Rees is authorized to conduct the business of the practice of law in the State of Missouri. Gordon Rees may be served with process via its registered agent, Business Filings Incorporated, located at 5661 Telegraph Rd., Ste. 4B, Saint Louis, MO 63129.  Gordon Rees holds itself out to the public and the insurance industry

3

as a firm that has a robust insurance group with well-honed skill in coverage, bad faith and appeal work, and in the insurance industry is highly strategic in representing its clients and knowledgeable and thorough in its analysis of insurance matters. Gordon Rees represents to the public that it provides end to end advice and effective representation to its insurer clients throughout the process from claim handling and investigations through suit, and that its trial lawyers in the insurance group have a proven record of defeating claims made by insureds.

8.     Morris is an individual and resident of the State of Missouri, and is therefore a citizen of the State of Missouri. Morris may be served at his residential address at 527 Bryan Ave., St. Louis, MO 63105.

9.     At all times relevant hereto, Morris was and is an attorney licensed to practice law in the State of Missouri and has, on information and belief, been a member, employee, authorized person, and/or agent of Gordon Rees practicing law in the State of Missouri, and was acting for the benefit of and within the scope of his employment with Gordon Rees. Morris and Gordon Rees had the duty to use that degree of skill and learning ordinarily used by members of the legal profession under the same or similar circumstances in the performance of their legal services for AmGUARD.

10.     This Court has subject matter jurisdiction over Morris and Gordon Rees pursuant to 28 U.S.C. § 1332(a) because the parties are of diverse citizenship and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

11.     This Court has personal jurisdiction over Defendants because Defendants committed torts in the State of Missouri.

12.     Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to this cause of action occurred within this

#34518152 v1

judicial district. Divisional venue is proper in the Eastern Division of this Court pursuant to Local Rule 2.07 because Defendant Morris resides in St. Louis County, Missouri.

## GENERAL ALLEGATIONS

### *The AmGUARD Policy, the accident, the Jefferson County Lawsuit, and initial developments*

13.     AmGUARD issued a commercial liability insurance policy to T&J Enterprises, Inc. as named insured, Policy No. K2GP005636, with effective dates of April 1, 2019, to April 1, 2020 (the "AmGUARD Policy"). A copy of the AmGUARD Policy is attached hereto as Exhibit 1.

14.     Subject to its terms, conditions, definitions, limitations, and exclusions, the AmGUARD Policy provided commercial auto liability coverage with $1,000,000 each accident.

15.     One of the vehicles listed in the declarations of the AmGUARD Policy was a 2012 Hino tow truck.

16.     On September 21, 2019, the 2012 Hino tow truck was involved in an accident which resulted in bodily injuries to Deborah Moses and her minor child M.M.

17.     The 2012 Hino tow truck was owned by Jeffrey Pyrtle, and it was operated by Michele Hill at the time of the accident.

18.     North American Risk Services ("NARS"), a third-party claim administrator of AmGUARD, began investigating the accident in September 2019.

19.     On October 29, 2019, Deborah Moses and minor M.M. filed suit against Michele Hill and Jeffrey Pyrtle in the Circuit Court of Jefferson County, Missouri, bearing case number 19JE-CC00784 (the "Jefferson County Lawsuit"). A copy of the original petition filed in the Jefferson County Lawsuit is attached hereto as Exhibit 2.

20.     In December 2019, AmGUARD assigned defense counsel to represent Michele Hill and Jeffrey Pyrtle in the Jefferson County Lawsuit.

21.     On February 20, 2020, Deborah Moses and M.M., through counsel Adam Grayson of the law firm Grayson & Grayson, demanded the $1,000,000 limit of the AmGUARD Policy to resolve the personal injury claims arising from the September 21, 2019, accident.

22.     As of the end of March 2020, NARS' claims adjusters, the defense counsel assigned to defend Michele Hill and Jeffrey Pyrtle in the Jefferson County Lawsuit, and personal counsel for T&J Enterprises and Jeffrey Pyrtle, had all advised that the liability exposure arising out of the September 21, 2019 accident was likely in excess of the $1,000,000 limit of the AmGUARD Policy and recommended that the demand be accepted.

### *Retention of Gordon Rees as Coverage Counsel*

23.     On April 1, 2020, AmGUARD determined that the entire claim should be reviewed for coverage, in that the investigation had revealed that Michele Hill did not possess a commercial driver license and may not have been an authorized driver of the 2012 Hino tow truck.

24.     On April 2, 2020, AmGUARD hired Gordon Rees as coverage counsel with respect to the accident, to review the entire file for coverage, and to provide AmGUARD and NARS recommendations for further handling.

25.     Gordon Rees accepted the assignment, thereby establishing an attorney-client relationship whereby Gordon Rees would provide legal advice to AmGUARD and NARS regarding claims arising out of the September 21, 2019, accident.

26.     Gordon Rees assigned Morris as lead counsel on the file.

### *Gordon Rees' Preliminary Coverage Opinions*

27.     On April 2, 2020, Gordon Rees advised AmGUARD that it would secure documents and information from NARS, conduct initial due diligence regarding the incident,

6

parties, court, and counsel, prepare a preliminary memo addressing coverage, and reach back out to AmGUARD within a week to discuss initial impressions and analysis.

28.    Neither Morris nor anyone else at Gordon Rees performed any of those tasks within the timeframe promised.

29.    On April 2, 2020, another attorney from Gordon Rees, Ryan Brown, advised AmGUARD that Michele Hill should not be entitled to medical payments coverage due to an exclusion pertaining to the use of a vehicle without a reasonable belief of entitlement to do so. This advice was improperly provided by Ryan Brown and Gordon Rees without having undertaken any sort of investigation, legal analysis, or factual analysis.

30.    On April 7, 2020, without having undertaken any meaningful review of the factual record (the claim file materials and the copy of the petition from the Jefferson County Lawsuit had not been received by that date), and without having carried out any meaningful legal analysis, Morris advised AmGUARD that his initial assessment was that there was no coverage for Michele Hill.

31.    On April 15, 2020, NARS asked Morris about what the bad faith repercussions may be if the policy limit demand was not accepted. Without undertaking any meaningful legal analysis or review of the facts of the underlying lawsuit, Morris advised that he did not think the claimants (Moses and M.M.) could prove negligent entrustment.

32.    On that same date, Morris also provided erroneous advice concerning insurance coverage issues involving permissive use of an auto as it pertained to the applicability of coverage for Michele Hill.

33.    On April 16, 2020, Morris emailed AmGUARD to advise that the policy-limit demand did not satisfy the 90-day requirement of RSMo. § 537.058, and further advised, "Failure

7

to comply with this statute eliminates a later claim for bad faith based upon a failure to meet the demand." However, Morris provided this advice without having received or reviewed the letter of demand. Morris also failed to advise that RSMo. § 537.058 was a newly enacted statute, about which there was very little reported case law, and that the statute only provided an evidentiary rule with respect to lawsuits filed by "a claimant as an assignee of the tort-feasor or by the tort-feasor for the benefit of the claimant." Morris's advice that failure to comply with the statute "eliminates a claim for bad faith" was not accurate, and providing that as justification for not accepting the demand was improper.

### *Morris's Initial Coverage Analysis Letters*

34.     Also on April 16, 2020, Morris provided his initial coverage analysis letter to AmGUARD.

35.     Apparently realizing that the April 16, 2020, coverage analysis letter did not address all the topics about which AmGUARD requested analysis, Morris provided a revised coverage analysis in a letter dated April 17, 2020.

36.     In this letter, Morris correctly advised that "there will likely be coverage for any judgment entered against [Jeff Pyrtle] or the Named Insured [T&J Enterprises] for the plaintiffs' claims, whether based upon vicarious liability or negligent hiring or retention." However, Morris inexplicably forgot about this and later recommended that coverage for T&J Enterprises be denied.

37.     This letter failed to mention or describe the policy limit demand in its factual background section, and it failed to accurately cite case law to support propositions of law pertaining to the duty to indemnify and bad faith liability.

8

38.     The letter failed to discuss whether the policy limit demand complied with any requirement of RSMo. § 537.058 other than the 90-day requirement, and it failed to discuss any of the assertions in the demand letter concerning liability and damages.

39.     Despite reciting nearly a page of purported case law concerning what constitutes bad faith, the letter did not discuss or analyze any of the factors that would go into determining whether failing to pay the policy limit at that time (which had already been suggested/demanded by NARS, assigned defense counsel, and T&J Enterprises' personal counsel) would result in bad faith liability. The letter instead simply (and erroneously) stated that AmGUARD did not risk acting in bad faith because the demand was not open for 90 days. Like the email Morris sent the day prior, the letter did not discuss whether there was any case law addressing Section 537.058 and its effect on bad faith claims, or whether there may be any issues concerning the statute's enforceability or applicability to various ways in which an insurer may face extra-contractual liability.

40.     With the policy limit demand set to expire within a week of the date of this letter, this unreasonably short and incomplete analysis regarding the facts supporting the demand, liability and damages reasons for potentially accepting the demand, the insistence by several parties that the demand should be accepted, and the factors that are actually recited in Morris's letter, contributed to Morris recommending, and AmGUARD authorizing, rejection of the opportunity to have the claim resolved within the policy limits.

41.     The letter included a multitude of other errors and assertions unsupported by proper factual and legal analysis, including, but not limited to: (a) recommending that Jeff Pyrtle be defended under a reservation of rights, despite there being no applicable coverage defenses related to him referenced in the letter; (b) misidentifying the date of the accident; (c) incorrectly advising

9

that there was no coverage for Michele Hill without correct factual or legal analysis; (d) failing to cite the sources of the facts upon which the analysis was prepared; (e) failing to adequately discuss the development and investigation of the claim; (f) failing to adequately describe the allegations and claims asserted in the Jefferson County Lawsuit; (g) failing to recite all relevant provisions of the AmGUARD Policy, particularly the listed driver endorsement, which was a significant part of what gave AmGUARD cause to retain coverage counsel in the first place; (h) reciting policy provisions that were never discussed or analyzed in the letter; (i) failing to accurately cite case law concerning the issue of estoppel; (j) failing to accurately describe, discuss, and apply Missouri law regarding estoppel; (k) failing to thoroughly and accurately analyze all aspects of the auto exclusion in the AmGUARD Policy's CGL coverage part; (l) failing to cite any case law when discussing that exclusion; (m) failing to thoroughly and accurately analyze all aspects of the insuring agreement in the AmGUARD Policy's commercial auto coverage part; (n) failing to cite any case law when discussing the definition of "insured" in the commercial auto coverage part; (o) incorrectly stating, without any insurance policy language or case law in support, that "Coverage for Mr. Pyrtle as an individual would require that the court find Mrs. Pyrtle [sic] had the Named Insured's permission to operate the Truck;" (p) improperly providing an incomplete analysis of the liability merits of the tort claims against Jeffrey Pyrtle; (q) failing to cite any case law in the incomplete discussion of the liability merits of the tort claims; (r) intermixing discussion of the CGL coverage part with discussion of the commercial auto coverage part; (s) incorrectly suggesting that coverage for Jeff Pyrtle or T&J Enterprises under the CGL coverage part depends on whether either gave consent to Michele Hill to drive the truck; (t) conflating issues of coverage with issues of tort liability; (u) failing to thoroughly and accurately discuss whether Earl Hill was an "insured" under the commercial auto liability coverage; (v) failing to cite policy language or

10

case law for the incorrect proposition that Earl Hill would need to be an executive officer to qualify as an "insured" without operating the vehicle; (w) failing to accurately analyze and discuss the case law cited with respect to the issue of permissive use; (x) failing to analyze facts which the cited case law instructed were pertinent to the issue of permissive use; (y) failing to discuss all policy provisions and related case law pertinent to whether the CGL coverage applied to Michele Hill; (z) conflating CGL coverage issues with commercial auto coverage issues; (aa) incorrectly suggesting that only Jeff Pyrtle's testimony would impact whether Michele Hill is afforded coverage; (bb) failing to recommend that Michele Hill or Earl Hill be interviewed; (cc) recommending that a declaratory judgment action be filed; (dd) failing to explain the legal significance of filing a declaratory judgment action; (ee) failing to discuss whether the AmGUARD Policy contained conditions requiring an insured (or potential insured) to provide examinations under oath; (ff) failing to comment on the reservation of rights letter that had initially been drafted by NARS; and (gg) failing to recommend that a reservation of rights letter be sent only to Michele Hill and not to T&J Enterprises (who at that time had not even been named in the lawsuit).

42.     After the letter was sent, in response to an inquiry from NARS about examinations under oath, Morris again failed to mention whether the AmGUARD Policy required the insureds (or potential insureds) to provide examinations under oath. Morris also advised that he could not simply prepare an affidavit for Jeff Pyrtle to sign because he did not know what Jeff Pyrtle's testimony would be, which calls into question how Morris was able to provide so many opinions with respect to coverage (and liability) in his initial coverage analysis letter if he did not know what anyone's testimony on the purportedly most important factual issues would be.

11

43.     Morris also advised NARS, "I'm aware of all of the case law on bad faith, ROR, coverage, etc. in Missouri," and "I have handled bad faith and coverage matters for many years and have written and given CLE seminars on bad faith."

***Response to the First Policy Limits Demand***

44.     On April 22, 2020, with the policy demand set to expire in one day, Morris still had not obtained a copy of the demand letter or the enclosures that were included with it. As such, Morris had improperly provided advice with respect to the validity of the time-limited demand and what AmGUARD's response should be without ever having reviewed the demand or its supporting materials. Despite having advised how AmGUARD should respond to the demand, Morris could not have known whom the demand offered to release from liability or any other potentially pertinent details of the demand. Furthermore, when discussing with AmGUARD on this date how to respond to the demand, Morris again failed to provide an explanation as to the lack of case law interpreting and applying RSMo. Section 537.058 or whether there could potentially be any repercussions from not accepting a policy limit demand notwithstanding the demand not being left open for 90 days, particularly since NARS, defense counsel, and T&J Enterprises' personal counsel all were advising that the demand should be paid.

45.     On April 23, 2020, Morris sent a letter, on behalf of AmGUARD, to counsel for claimants Moses and M.M., advising that the demand would be rejected because of coverage issues that needed to be investigated.  Morris explained in the letter that he had requested an examination under oath from Jeffrey Pyrtle, that he would like to obtain EUOs from Michele Hill and Earl Hill as well, and that after those examinations AmGUARD would be in a better position to provide a conclusive coverage opinion to AmGUARD and then AmGUARD will be in a position to evaluate and respond to the demand.

12

#34518152 v1

46.    There was no justification for Morris to divulge to the claimants' attorney the status of the coverage investigation or to use that as an excuse for not accepting the demand. The details of the coverage investigation should be none of claimants' counsel's business. Moreover, by advising the claimants' attorney that there were coverage issues, that provided claimants' counsel with privileged insured/insurer information and would provide the claimants' counsel with the opportunity to convince the insureds to cooperate in developing facts that are favorable to coverage and/or to enter into a Section 537.065 agreement in the future to the detriment of Defendants' own client AmGUARD.

47.    Based on Morris's improper, inaccurate, incomplete, and insufficient advice, AmGUARD declined to resolve the claims against its insureds within the limits of the AmGUARD Policy.

### *Reservation of Rights Letters*

48.    Morris undertook to draft and/or revise reservation of rights letters that were sent with respect to the Jefferson County Lawsuit. Two such letters were sent on April 23, 2020.

49.    The reservation of rights letter sent to Michele Hill included several deficiencies, including, but not limited to: (a) misidentifying the date of the accident; (b) failing to mention the limit of coverage; (c) failing to provide any explanation as to why Michele Hill might not qualify as an insured under the AmGUARD Policy; (d) failing to explain any potential issues with permission to use the vehicle or any of the facts which Morris's coverage analysis letter purported to give rise to that coverage issue; and (e) failing to otherwise give Michele Hill adequate notice of the basis for the reservation of rights.

50.    Morris also improperly recommended (or at least did not recommend against) sending a reservation of rights letter to T&J Enterprises. It was improper for such a letter to be sent

13

#34518152 v1

to T&J Enterprises, both because T&J Enterprises had not yet been named in the lawsuit, and because there were no applicable coverage defenses with respect to T&J Enterprises. Indeed, the letter that was sent to T&J Enterprises did not explain any sort of coverage defense that might apply to limit coverage for T&J Enterprises; it instead asserted that Michele Hill may not qualify as an "insured," without providing sufficient explanation as to why that may be.

51.     A first amended petition was filed in the Jefferson County Lawsuit on May 6, 2020. A copy of the first amended petition is attached hereto as Exhibit 3. Morris improperly failed to advise AmGUARD whether an updated reservation of rights letter would need to be sent to Michele Hill based on the new allegations in the first amended petition.

### *Recorded Statement of Jeffrey Pyrtle*

52.     On May 5, 2020, Morris advised AmGUARD and NARS that he had attempted to coordinate with the attorney hired by AmGUARD to defend Jeff Pyrtle for Mr. Pyrtle to be made available for an examination under oath, but defense counsel advised that Morris would need to deal with Mr. Pyrtle's personal counsel Kevin Roberts for that. Morris should have known that defense counsel could not be involved in the coverage investigation in that way and that he would need to work with the insureds' personal counsel.

53.     Morris also advised that he had emailed Kevin Roberts to request the examination under oath. Morris advised that if he did not hear back from Mr. Roberts by the following day, then Morris would recommend issuing a subpoena for Jeffrey Pyrtle's testimony. Although AmGUARD was not at that time a party to any lawsuit in which a court could possibly issue a subpoena, Morris absurdly advised that he "can file a miscellaneous action and have a subpoena issued under that matter." There is no mechanism under Missouri law that would allow an insurance company to file a lawsuit for the purpose of obtaining a subpoena to compel an insured to provide an examination

14

#34518152 v1

under oath. Morris should have known that, and the proposition that he could file such a "miscellaneous action" to obtain a subpoena demonstrates a significant misunderstanding of the law.

54.     On May 14, 2020, Morris advised AmGUARD and NARS that Jeffrey Pyrtle's personal attorney Kevin Roberts had pushed back on the request for an examination under oath, stating that the AmGUARD Policy does not require his client to give an examination under oath. Morris again failed to advise whether the AmGUARD Policy contains an EUO requirement, nor did he advise as to what it might mean for the investigation that the insured's personal attorney was challenging the ability of Morris to take an EUO.

55.     Morris also advised that an amended petition had been filed in the Jefferson County Lawsuit (information he received from Mr. Roberts). The first amended petition included new causes of action and added T&J Enterprises, Inc. as a defendant. Morris failed to provide AmGUARD or NARS any sort of explanation or analysis as to the new allegations asserted in this amended pleading at this time, and he did not provide any sort of updated coverage analysis until six months later.

56.     On May 19, 2020, Morris advised AmGUARD and NARS that he would be taking a recorded statement from Jeffrey Pyrtle and then transcribe the statement into an affidavit for Mr. Pyrtle's signature. Morris never transcribed the statement into an affidavit and never obtained Mr. Pyrtle's signature.

57.     Morris also advised AmGUARD and NARS that he believed Jeff Pyrtle would provide an honest statement which would confirm there was no permissive use and no coverage for Michele Hill. Not only did Morris lack a basis for his belief in the credibility of Jeff Pyrtle or the veracity of the information that he may provide, but Morris also made a self-fulfilling prophecy

15

as to what Jeff Pyrtle's testimony will be and that it would confirm no coverage. It was improper for Morris to use the recorded statement as an attempt to obtain facts to defeat coverage; the investigation should simply be for obtaining all pertinent facts in an objective manner and then applying those facts to the coverage provisions and applicable case law.

58. Morris also advised AmGUARD and NARS that he would have a court reporter present for the recorded statement, but he failed to do so.

59. NARS asked Morris to ask several specific questions of Mr. Pyrtle and to provide NARS a list of the questions he planned to ask; Morris failed to ask the questions requested by NARS and failed to provide NARS with a list of questions.

60. NARS requested that Morris also take statements from Michele Hill and her husband Earl Hill (the purported T&J Enterprises employee who asked Michele Hill to drive the tow truck) to get both sides of the story for coverage. Morris replied, "I do not believe it will be necessary to obtain EUOs for Mr. and Mrs. Hill." This was despite the fact that Morris had previously recommended that their statements/EUOs be taken (and his communication to the claimants' attorney that he would be taking such investigative measures). It was improper of Morris to limit his investigation to interviewing only one witness when it was clear that the accounts of the Hills would also be pertinent to determining the issues concerning permission and authority to grant it. When NARS pointed these issues out to Morris, Morris ignored them.

61. On May 21, 2020, Morris took a recorded statement via three-way telephone conference call between himself, Kevin Roberts' office, and Jeffrey Pyrtle, limiting Morris's ability to judge the credibility of Mr. Pyrtle.

62. Morris's interview consisted of many leading questions, resulting in many one-word "no" or "yes" answers. The leading questions were usually phrased in a way to lead Pyrtle

16

to say that Michele Hill did not have permission. Morris hardly asked any open-ended questions and never asked Pyrtle to generally explain the duties of truck drivers and other workers, any involvement Michele Hill had with the company, or the general facts of the accident. Additionally, at one point when Mr. Pyrtle paused concerning whether Earl Hill had authority to allow Michele Hill to drive, Morris cut him off and did not allow Pyrtle to fully answer.

63.    Morris failed to ask the detailed questions that NARS had requested that he ask, and many times he failed to ask follow-up questions for additional details.

64.    Morris advised Mr. Pyrtle and Mr. Roberts that he planned to obtain a transcript of the call, then send a copy of the transcript to Mr. Pyrtle and Mr. Roberts and have them confirm the accuracy and truthfulness of the statement in an affidavit. Morris never provided a transcript to Mr. Pyrtle or Mr. Roberts for them to review for accuracy and truthfulness.

65.    A week after the recorded statement, on May 29, 2020, Morris emailed NARS to advise that he had completed the recorded statement and would obtain an affidavit from Mr. Pyrtle attesting to the truth and accuracy of the transcript. Morris never attempted to obtain such an affidavit.

66.    More than a month later, on July 14, 2020, NARS emailed Morris asking for a copy of the recorded statement. Morris provided what he purported to be a copy of the transcript, but it was in an unreadable file format. When NARS followed up with Morris over the following months advising that they could not read the transcript and requested a clear transcript, Morris ignored those requests. Additionally, Morris did not provide a copy of the audio file in a timely fashion to anyone at NARS and did not provide it to anyone at AmGUARD until around the time that his representation of AmGUARD was terminated in January 2023.

17

#34518152 v1

*__Morris's Disregard for the Statement of Michele Hill__*

67.    Following the recorded statement of Jeffrey Pyrtle, Morris failed to make any efforts to obtain a statement from anyone else, including Michele Hill.

68.    On July 14, 2020, NARS advised Morris that Michele Hill had contacted NARS and reported that she had T&J Enterprises' and/or Jeff Pyrtle's permission to drive the tow truck, which was contrary to the information provided by Jeff Pyrtle in the recorded statement taken by Morris.

69.    Morris completely disregarded the new information from NARS. Morris never undertook any further investigation regarding the conflicting information, he never asked NARS for additional details regarding what Ms. Hill stated, he never tried to contact Ms. Hill for an interview, and he never incorporated this new information into his coverage analysis.

*__Morris's Final Coverage Analysis Letter__*

70.    Although he did not undertake any further investigation following the May 21, 2020, recorded statement, Morris waited until November 24, 2020, to provide AmGUARD his final coverage analysis letter. In the interim, Morris failed to properly keep AmGUARD and NARS advised of the coverage investigation, and he failed to thoroughly analyze the coverage issues, as evidenced by the deficient coverage analysis letter.

71.    Morris's final coverage analysis letter is dated November 24, 2020.

72.    The final coverage analysis letter began with the incorrect statement that there would only be coverage for T&J Enterprises if there were a determination that Michele Hill had the insured's permission to drive the vehicle. There is no provision anywhere in the AmGUARD Policy which suggests that coverage for T&J Enterprises is affected at all by whether a driver of a covered auto has permission to drive. By virtue of being named insured, T&J Enterprises is always

18

an "insured." There are no provisions in the insuring agreement, nor are there any exclusions, which make coverage for T&J Enterprises dependent on whether the driver has anyone's permission to drive. Morris failed to correctly read and analyze the AmGUARD Policy.

73.     The beginning of the letter then improperly recommended that AmGUARD provide a defense to all the defendants under a reservation of rights. Since there were not any coverage defenses applicable to T&J Enterprises, there was no reason for the defense afforded to T&J Enterprises to have been pursuant to a reservation of rights.

74.     The beginning of the letter also improperly recommended that "consideration should be given to filing a declaratory judgment action in order to best protect the insured and to provide AmGUARD clarity with regard to its duty to defend." Here, and elsewhere in this letter, Morris failed to explain that, under Missouri law, filing a declaratory judgment action "is treated as a refusal to defend, and, if determined to be unjustified, the insurer is treated as if it waived any control of the underlying tort action." *Allen v. Bryers*, 512 S.W.3d 17, 32 (Mo. banc 2016). Since there were no applicable coverage defenses pertaining to T&J Enterprises, there never should have ever been any sort of thought or suggestion about filing a declaratory judgment action against T&J Enterprises.

75.     Demonstrating Morris's failure to understand basic concepts of Missouri insurance law, Morris asserted that filing a declaratory judgment action would "best protect the insured," even though filing a declaratory judgment action is asking a court to rule that there is no coverage, i.e., no protection from the tort claim asserted against it. Morris also erroneously advised that filing a declaratory judgment action "would provide AmGUARD clarity with regard to its duty to defend," despite Missouri law which instructs that the duty to defend is based on the allegations of the underlying lawsuit. *Allen*, 512 S.W.3d at 31. Morris failed to provide any explanation or

19

reasoning as to how filing a declaratory judgment action would provide clarity with respect to the duty to defend when Morris had repeatedly advised in this letter that such a duty existed. Moreover, the duty to defend (as well as the duty to indemnify) unquestionably applied with respect to T&J Enterprises, to whom no coverage defenses applied.

76.     As it turned out, the filing of the declaratory judgment action recommended by Morris directly and proximately resulted in AmGUARD facing eight-figure exposure in alleged bad faith liability.

77.     In the body of the letter, Morris advised that "there will likely be coverage for any judgment entered against … the Named Insured for the plaintiffs' claims if the judgment is based upon the vicarious liability claim." Morris failed to advise concerning the other causes of action against T&J Enterprises, for which there was indisputably coverage.

78.     The body of the letter also failed to mention or describe the policy limit demand in its factual background section, and it failed to accurately cite case law to support propositions of law pertaining to the duty to indemnify and bad faith liability. The letter also failed to discuss whether the previous policy limit demand complied with any requirement of RSMo. § 537.058 other than the 90-day requirement, nor did it discuss any of the assertions in that previous demand letter concerning liability and damages.

79.     Like the initial coverage analysis letter (from which much of the November letter was copied and pasted), this letter recited nearly a page of purported case law concerning what constitutes bad faith, but did not discuss or analyze any of the factors that would go into determining whether failing to pay the policy limit at that time (which had already been suggested/demanded by NARS, assigned defense counsel, and T&J Enterprises' personal counsel) would result in bad faith liability. The letter instead simply (and erroneously) stated that

20

AmGUARD did not risk acting in bad faith because the demand was not open for 90 days. The letter did not discuss whether there is any case law addressing Section 537.058 and its effect on bad faith claims, or whether there may be any issues concerning the statute's enforceability or applicability to various ways in which an insurer may face extra-contractual liability.

80.    Additionally, this letter mentioned that a more recent demand had been made by the claimants' counsel, but did not provide any analysis or discussion of that demand and whether it complied with the statute (or otherwise may result in a bad faith claim if not accepted). Nor did Morris request a copy of the new demand so that he could review and analyze whether it complied with the statute and what the repercussions may be if the new demand was not timely accepted.

81.    At the conclusion of the letter, Morris improperly allowed a tort liability issue to influence his coverage analysis, as his recommendations began by stating, "If the trial court does not find Michele Hill was permitted to drive the vehicle by the defendants, those defendants cannot be liable for the plaintiffs' injuries." Even if it were true that T&J Enterprises could not be liable for the plaintiffs' injuries if Michele Hill did not have permission to drive the vehicle, that would be an argument for the defense attorneys representing T&J Enterprises in the Jefferson County Lawsuit to make. An analysis of that tort liability issue had no place in a discussion regarding the scope of coverage under the AmGUARD Policy.

82.    Morris then made a crucially incorrect statement regarding the scope of coverage for T&J Enterprises, positing that "coverage for all defendants rests on whether Michele Hill was permitted to drive the vehicle by the Named Insured." Neither the AmGUARD Policy nor any reported case law could possibly support such a proposition with respect to the issue of coverage for T&J Enterprises. As named insured, T&J Enterprises was as an "insured" without any further qualification, and neither the insuring agreement nor any exclusions contain any provisions which

21

limit the scope of coverage afforded to T&J Enterprises based on a driver's permission to drive. It was patently incorrect for Morris to suggest otherwise, and professionally negligent of him to do so, especially without any legal analysis supporting such a proposition.

83.     Then, Morris repeated the improper recommendation to file a declaratory judgment action against T&J Enterprises. Since there were no applicable coverage defenses pertaining to the claims asserted against T&J Enterprises, there was no valid basis for filing a declaratory judgment action and seeking judicial determination that the AmGUARD Policy afforded no coverage to T&J Enterprises. Additionally, Morris failed to mention that Missouri law treats the filing of a declaratory judgment action as a refusal to defend. *Allen v. Bryers*, 512 S.W.3d 17, 32 (Mo. banc 2016). Morris apparently was unaware of such case law, which is found in multiple reported cases from Missouri's appellate courts, since he concluded elsewhere in the coverage opinion letter that there was a duty to defend T&J Enterprises.

84.     Morris recommended that the declaratory judgment action be filed to establish that Michele Hill did not have permission to drive the vehicle. However, the AmGUARD Policy contains no language to suggest that the applicability of coverage for T&J Enterprises is in any way affected by whether Michele Hill had permission to drive or qualified as an insured. Accordingly, Morris's conclusion that there can be no coverage for T&J Enterprises as a matter of law if facts are established showing an absence of permission was not supported by policy language or case law and was patently incorrect.

85.     Morris then improperly suggested, "it will be difficult to have the issue of permission determined without prolonged litigation and potentially may not be determined until trial" as justification for filing a declaratory judgment action. Here, Morris failed to acknowledge Missouri case law that the duty to defend is broader than the duty to indemnify and is based on the

22

potential for coverage. Even if there were some factual developments about permissive use (and even if such a development were relevant to the issue of coverage for T&J Enterprises, which it is not), that would only affect the potential duty to indemnify, not the duty to defend, and would not justify filing a declaratory judgment action concerning the duty to defend.

86.    Finally, Morris asserted that "pursuit of a determination through a declaratory judgment action may therefore favorably influence the defense of the case as well." Morris provided no explanation for this proposition. It was a baseless reason for recommending that a declaratory judgment action be filed, which is something that should never have been recommended or even considered with respect to T&J Enterprises.

87.    The letter included a multitude of other errors and assertions unsupported by proper factual and legal analysis, including, but not limited to: (a) misidentifying the date of the accident; (b) falsely stating that all known facts and evidence indicated that Michele Hill did not have permission to drive the vehicle; (c) consciously disregarding contrary evidence provided in Michele Hill's statement to NARS; (d) failing to reference anything other than pleadings, the AmGUARD Policy, and the claim file as materials relied upon when forming the analysis; (e) failing to sufficiently set forth the facts upon which the analysis was based or the sources of the factual information; (f) failing to adequately discuss the development and investigation of the claim; (g) failing to adequately describe the allegations and claims asserted in the first amended petition of the Jefferson County Lawsuit; (h) failing to recite all relevant provisions of the AmGUARD Policy, particularly the listed driver endorsement, which was a significant part of what gave AmGUARD cause to retain coverage counsel in the first place; (i) reciting policy provisions that were never discussed or analyzed in the letter; (j) failing to accurately cite case law concerning the issue of estoppel; (j) failing to accurately describe, discuss, and apply Missouri law

regarding estoppel; (l) failing to thoroughly and accurately analyze all aspects of the auto exclusion in the AmGUARD Policy's CGL coverage part; (m) failing to cite any case law when discussing that exclusion; (n) failing to thoroughly and accurately analyze all aspects of the insuring agreement in the AmGUARD Policy's commercial auto coverage part; (o) failing to cite any case law when discussing the definition of "insured" in the commercial auto coverage part; (p) incorrectly stating, without any insurance policy language or case law in support, that coverage for the Pyrtles and T&J Enterprises would require that the court find Michele Hill had the Named Insured's permission to operate the truck; (q) improperly providing an incomplete analysis of the liability merits of the tort claims; (r) failing to cite any case law in the incomplete discussion of the liability merits of the tort claims; (s) intermixing discussion of the CGL coverage part with discussion of the commercial auto coverage part; (t) incorrectly suggesting that coverage for Jeff Pyrtle or T&J Enterprises under the CGL coverage part depends on whether either gave consent to Michele Hill to drive the truck; (u) conflating issues of coverage with issues of tort liability; (v) failing to thoroughly and accurately discuss whether Earl Hill was an "insured" under the commercial auto liability coverage; (w) failing to cite policy language or case law for the incorrect proposition that Earl Hill would need to be an executive officer to qualify as an "insured" without operating the vehicle; (x) failing to accurately analyze and discuss the case law cited with respect to the issue of permissive use; (y) failing to analyze facts which the cited case law instructed were pertinent to the issue of permissive use; (z) failing to discuss all policy provisions and related case law pertinent to whether the CGL coverage applied to Michele Hill; (aa) conflating CGL coverage issues with commercial auto coverage issues; (bb) failing to recommend that Michele Hill or Earl Hill be interviewed; (cc) failing to identify the deficiencies in the previously sent reservation of

24

rights letters; and (dd) failing to comment on whether an updated reservation of rights letter needed to be sent to Michele Hill in light of the amended petition.

88.    In an email that Morris sent to AmGUARD along with the above-described coverage opinion letter, Morris incorrectly and improperly stated that there was no way for the plaintiffs to obtain a judgment against T&J Enterprises if Michele Hill did not have permission to drive the vehicle. Morris again provided an improper discussion of tort liability issues that should not be a part of the coverage analysis; whether T&J Enterprises could be liable in the absence of permission is entirely irrelevant as to whether the AmGUARD Policy affords coverage for T&J Enterprises.

89.    Morris then recommended again in the email that a declaratory judgment action be filed as an alternative to waiting for the issue of permission to be determined in the underlying case. Morris again failed to advise that filing a declaratory judgment action amounts to a denial of coverage under Missouri law and would be contrary to Morris's conclusion that there is a duty to defend T&J Enterprises. Additionally, Morris improperly suggested that AmGUARD file a declaratory judgment action to determine whether the plaintiff can obtain a judgment against T&J Enterprises. Morris should have known that insurance companies cannot file declaratory judgment actions to determine the insured's liability to the tort claimant; insurance companies lack the standing to do so, and such a suit would be subject to dismissal due to abstention and/or lack of standing. Morris should have known that if an insurer seeks to determine that the claimant cannot obtain judgment against its insured, the insurer should defend the insured and make arguments to that effect in the tort action against the insured. Morris's advice to the contrary was yet another instance of professional negligence.

#34518152 v1

90.     Morris also repeated the incorrect statement that the "universe of evidence" showed Michele Hill did not have permission to drive the tow truck. The only evidence mentioned in the coverage analysis letter was the recorded statement from Jeff Pyrtle; Morris disregarded the information obtained by NARS from Michele Hill, and he made no efforts to obtain the Hills' side of the story. Morris also did not do any investigation to determine whether there may be anything in the "universe of evidence" that would support the allegations regarding permissive use, other than his interview of Jeff Pyrtle.

91.     Finally, Morris's email advised that filing a declaratory judgment action was not the only option. However, Morris failed to explain what the other options would be, the pros and cons of selecting those options as opposed to proceeding with a declaratory judgment action, or whether those courses of action would be more appropriate considering Morris's own opinion that there was a duty to defend T&J Enterprises.

### *Morris's Commentary on a New Policy Limit Demand*

92.     On December 21, 2020, NARS advised Morris that it had received a letter from T&J Enterprises' personal counsel directing AmGUARD to pay the recently asserted $1 million policy limit demand. NARS asked Morris to provide his thoughts and opinions as to how to address the demand from the insured with the pending coverage issues that warranted filing the declaratory judgment action.

93.     Morris erroneously advised that AmGUARD had "a legitimate and reasonable belief that there exists no coverage for the claim …." There were no applicable coverage defenses with respect to T&J Enterprises. Morris also provided no legal authority for the implicit proposition that an insurance company acts in good faith by denying coverage when it merely has "a legitimate and reasonable belief" that no coverage exists, particularly when that belief is based

26

upon an inadequate and incorrect coverage analysis. In contrast, Missouri case law instructs that limiting the investigation of a matter solely to the question of coverage is evidence of bad faith. *Landie v. Century Indem. Co.*, 390 S.W.2d 558, 566 (Mo. App. 1965).

94.     Morris did not actually provide any advice on what (if any) response AmGUARD should make to the demand or the insureds' request that the demand be accepted, nor did Morris provide any thoughts or analysis concerning the new policy limit demand.

95.     Instead, Morris commented that the letter from T&J Enterprises' personal counsel "underscores our need to file the [declaratory judgment action.]" Morris failed to provide any explanation as to why the policy limit demand or the insured's insistence that the suit be settled within policy limits were reasons to file a declaratory judgment action (something which, under Missouri law, would be inconsistent with Morris's determination that a duty to defend exists).

96.     Morris then recommended that he send a letter to T&J Enterprises' attorneys to explain the reasoning for filing a declaratory judgment action and to assure T&J Enterprises that AmGUARD would continue to provide a defense in the tort action. Such a suggestion does not make much sense considering Missouri case law instructing that filing a declaratory judgment action amounts to a refusal to defend, and because the declaratory judgment action sought a determination that there was no duty to defend.

### *Morris's Letter Disclaiming Coverage*

97.      On December 22, 2020, Morris sent a letter to defense counsel and personal counsel for T&J Enterprises to discuss the declaratory judgment action that would be filed against T&J Enterprises by AmGUARD.

98.     In the letter, Morris advised, "there is no coverage for any of the defendants named in the [Jefferson County] Lawsuit." This statement amounted to a denial of coverage. Since there

27

were no applicable coverage defenses with respect to T&J Enterprises, this statement amounted to an unjustified denial of coverage and refusal to defend, such that AmGUARD "is treated as if it waived any control of the underlying tort action." *Allen v. Bryers*, 512 S.W.3d 17, 32 (Mo. banc 2016). Moreover, the unjustifiable denial of coverage recommended and carried out by Morris amounted to bad faith attributable to AmGUARD.

99.   Morris's contention that there was no coverage for T&J Enterprises was not supported by any policy provisions, case law, legal analysis, or even much of an explanation. Morris simply stated that there was no coverage because Mr. Pyrtle purportedly stated in an interview that Michele Hill did not have permission to drive the truck. Again, there are no provisions in the AmGUARD Policy that could possibly be interpreted as requiring that a driver have permission in order for there to be coverage for the named insured T&J Enterprises. The inability to cite any policy language or legal reasoning as to why there was no coverage for T&J Enterprises should have alerted Morris to the fact that his conclusion in that regard was incorrect.

100.   In this letter, Morris also asserted that "it is evident from the facts, which do not appear to be disputed, that Michelle Hill did not receive permission to drive the tow truck from T&J Enterprises, Inc." However, Morris had only conducted one interview (of Jeff Pyrtle); he did not interview either of the Hills. Additionally, Morris ignored and/or disregarded the report from NARS that Michele Hill had advised that she did have T&J Enterprises' permission. Furthermore, Morris included reference to facts that were only pertinent to his incorrect understanding of secondary permittee law, and he baselessly and irrelevantly asserted that there was no legal basis upon which any of the defendants, other than Michele Hill, could possibly be liable for the claimants' injuries.

#34518152 v1

101.    Finally, Morris asserted in this letter that there was no legal basis under which T&J Enterprises could be held liable for the plaintiffs' injuries. Once again, Morris conflated issues of coverage with issues of tort liability. Whether T&J Enterprises could have tort liability to the plaintiffs had nothing to do with coverage or what could possibly be determined in a declaratory judgment action.

**_Complaint for Declaratory Judgment_**

102.    Also on December 22, 2020, Morris filed a declaratory judgment action on behalf of AmGUARD in the United States District Court for the Eastern District of Missouri, case number 4:20-cv-01853 (the "Declaratory Judgment Action"). T&J Enterprises was named as one of the defendants in the Declaratory Judgment Action. A copy of the complaint filed by Morris in the Declaratory Judgment Action is attached hereto as Exhibit 4.

103.    In the complaint, Morris improperly alleged that there was no coverage under the AmGUARD Policy because, according to Morris, there were no circumstances under which T&J Enterprises could be liable in tort to the plaintiffs because Michelle Hill did not have permission to drive the truck. This allegation was entirely improper for a declaratory judgment action. The issue to be decided in a declaratory judgment action is whether there is coverage for the claim asserted against the insured. The issue of whether T&J Enterprises can be liable in tort to the plaintiffs was to be decided in the underlying Jefferson County Lawsuit.

104.    Morris also included an allegation in the complaint that the AmGUARD Policy did not provide coverage for T&J Enterprises based upon the facts currently known. Such an allegation was false, as there were no applicable coverage defenses pertaining to T&J Enterprises.

105.    Additionally, Morris included allegations in the complaint which improperly suggested that T&J Enterprises might not qualify as an "insured" if Michele Hill was deemed to

29

#34518152 v1

not qualify as an "insured." Morris failed to take into consideration the part of the definition of "insured," recited multiple times in the complaint, which extends "insured" status to T&J Enterprises merely by virtue of being the named insured on the AmGUARD Policy, without any qualification or limitation.

106.    Another allegation included by Morris in the complaint was that coverage for T&J Enterprises would only be available if T&J Enterprises gave Michele Hill permission to use the tow truck. Once again, nothing in the Policy makes *coverage* for T&J Enterprises contingent on it giving permission to the driver.

107.    Further, Morris included an allegation in the complaint that there was no coverage under the AmGUARD Policy for the Jefferson County Lawsuit, an allegation which was inconsistent with Morris's previous assertions in his letter to AmGUARD that there was a duty to defend and coverage for T&J Enterprises. The allegations included in the complaint by Morris suggested that there was no duty to defend because his interview with Jeff Pyrtle suggested that there would not be a duty to indemnify. Such a view is contrary to the case law instructing that the duty to defend is broader than the duty to indemnify and is dismissive of the possibility that other witnesses may have testimony which controverts the information that Jeff Pyrtle provided to Morris in the recorded interview.

108.    Once again, Morris included the legally incorrect allegation that "the availability of coverage for any of the defendants in the Lawsuit turns on a single legal issue – whether Michelle Hill had T&J Enterprises' permission to operate the tow truck …." This is patently incorrect, especially as it pertains to the issue of coverage for T&J Enterprises, since T&J Enterprises, by virtue of being named insured, was covered for any auto accident involving any auto, regardless of whether the driver had its permission to drive. Additionally, the allegations made by Morris

30

#34518152 v1

concerning Earl Hill's authority to give permission, Michelle Hill's employment status and licensing, and T&J Enterprises' knowledge about Michelle Hill's operation of the truck, were entirely irrelevant to the issue of *coverage* for T&J Enterprises.

109. Relatedly, Morris included an allegation that because T&J Enterprises did not legally give Michele Hill permission to drive the truck, "there is no coverage available to any of the defendants for the claims" asserted in the Jefferson County Lawsuit. Once again, there is nothing in the AmGUARD Policy to support such a proposition.

110. The "Wherefore" paragraph at the end of the declaratory judgment complaint asked that the court enter an order and judgment that there was no duty to defend T&J Enterprises. Such a request is inconsistent with Morris's advice to AmGUARD that there was a duty to defend T&J Enterprises, as well as the policy language which did not even provide a reasonable basis for reserving any rights to deny coverage to T&J Enterprises.

111. The complaint included a multitude of other errors and incorrect assertions, including, but not limited to: (a) failing to allege the citizenship of each of the parties, so as to establish the federal court's subject matter jurisdiction; (b) failing to proofread for typos (such as "next fried" and "two truck"); (c) failing to accurately and fully describe what had been alleged in the Jefferson County Lawsuit, particularly with respect to the amended petition; (d) incorrectly asserting that a reservation of rights letter was issued to each of the defendants; (e) failing to include the reservation of rights letter sent to Michele Hill as an exhibit to the complaint; (f) incorrectly including allegations suggesting that the duty to defend is based upon the insurer's investigation and not the allegations in the underlying lawsuit; (g) unnecessarily listing every coverage form and endorsement, by number and heading, contained in the AmGUARD Policy in the body of the complaint; (h) failing to allege the facts and legal reasons necessary for a court to

31

determine the applicability of the auto exclusion in the AmGUARD Policy's CGL coverage part; (i) failing to allege facts pertinent to secondary permittee law; (j) incorrectly and improperly suggesting that the Pyrtles can only have liability for Michele Hill's use of the truck if they granted her permission to use the truck; (k) needlessly alleging that commercial inland marine coverage and terrorism coverage did not apply; (l) incorrectly alleging that the availability of coverage for the Pyrtles turned on whether Michele Hill had T&J Enterprises' permission to operate the tow truck; and (m) incorrectly asserting that the issue of coverage depended on "the known facts and evidence," and that such facts and evidence were only those derived from Jeff Pyrtle's recorded statement and no other sources (such as the information provided to NARS by Michele Hill).

112.    By filing the declaratory judgment action, Morris had, again, on behalf of AmGUARD unjustifiably denied coverage and refused to defend, such that AmGUARD would be "treated as if it waived any control of the underlying tort action." Moreover, the unjustifiable denial of coverage recommended and carried out by Morris amounted to bad faith attributable to AmGUARD.

### *Morris's Advice Regarding New Policy Limit Demand*

113.    On February 18, 2021, Morris was asked by NARS whether declining to pay the policy limit demand due to purportedly unresolved coverage issues in the Declaratory Judgment Action would result in bad faith exposure on the part of AmGUARD.

114.    Morris replied, without any case law citation, that an insurer is not obligated to settle every case that presents a chance of an excess verdict, and that the insurer's reasonable evaluation of liability is part of the equation as well. However, all of the information that had been provided to AmGUARD and NARS, as reflected in claim notes, was that this was a case of clear liability and that the damages would far exceed the $1 million limit. For Morris to mention

32

evaluations of liability and damages as a potential justification for rejecting the demand suggests a lack of attention to the facts of the case on which he was providing counsel.

115.    Morris also repeated his incorrect assertion that "absent permission by the named insured, Michele Hill does not enjoy coverage" under the AmGUARD Policy, while also failing to mention issues of coverage pertaining to T&J Enterprises.

116.    Morris further advised, without case law citation, that an insurer is not obligated to provide coverage where it does not exist. However, Morris's own correspondence had indicated that there would be coverage for T&J Enterprises. Morris improperly and nonsensically suggested that the fact that an insurer is not obligated to cover non-covered risks is justification for rejecting a policy limits demand which pertains to covered claims. Morris seemingly conflated issues of tort liability and coverage yet again, as he suggested that the insureds cannot be liable due to the reported lack of permission and therefore there was no coverage for the claim.

117.    Morris then stated, without any apparent support or reason to do so, that it was his expectation that the parties would not dispute the salient facts concerning how Michele Hill came to be operating the truck. Morris had not conducted sufficient investigation to properly form such an expectation, and he once again disregarded the information that NARS had obtained from Michele Hill.

118.    Morris also incorrectly stated, "questions of whether she was driving with the permission of the named insured (or Mr. or Mrs. Pyrtle) and/or acting as their agent are legal questions, which the federal court should be able to decide." Missouri's appellate court has explicitly explained, "The issue of permissive use of an automobile is a question of fact." *Safeco Ins. Co. of Am. v. Smith*, 318 S.W.3d 196, 200 (Mo. App. W.D. 2010). Moreover, since the issue of permission is (by Morris's own analysis of both the coverage and tort issues) pertinent to the

33

resolution of the underlying tort claim, the federal court could refrain from deciding the issue of permission on abstention principles. *See generally State Farm Fire & Cas. Co. v. Pit Stop Bar and Grill, LLC*, 2015 WL 4663492 (E.D. Mo. 2015).

119.    Morris then stated that he believed "the facts, evidence and the steps we have taken thus far do not reflect bad faith." Morris's investigation and legal analysis were materially deficient in depth and substance. Under Missouri law, evidence of bad faith can include "accept[ing] legal conclusions from outside counsel that [the insured] had no coverage without legal citation or reference," as well as denying coverage without completing a full investigation. *Shobe v. Kelly*, 279 S.W.3d 203, 211 (Mo. App. W.D. 2009). The steps taken by Morris on behalf of AmGUARD – conducting an inadequate coverage investigation and basing a denial of coverage on legal bases lacking in proper citation to and application of case law and policy language – were evidence of bad faith attributable to AmGUARD. Morris's assurances to NARS that no bad faith conduct had occurred were misguided.

120.    Morris further advised, "there is no valid reason to tender as there is no permission or authority from the insured to use the unit which is the key." Again, Morris did not fully investigate the factual issue or correctly analyze the legal issue, resulting in a recommendation that an opportunity to settle within policy limits be rejected based on flawed factual and legal reasons.

***Morris's Letter Rejecting the Policy Limit Demand***

121.    In a letter dated February 19, 2021, addressed to the claimants' attorney Adam Grayson, and on which T&J Enterprises' defense counsel and personal counsel were copied, Morris advised that AmGUARD was rejecting the policy limit demand.

122.    In the letter, Morris improperly and incorrectly asserted that there was no coverage for the claimants' claims because Michele Hill was not permitted by T&J Enterprises to drive the

34

tow truck. Once again, with respect to the issue of coverage for T&J Enterprises, this is a patently incorrect statement and is not supported by any policy language or legal reasoning.

123.    Morris also asserted in the letter that the Jefferson County Lawsuit triggered a defense obligation, which is inconsistent with Morris's advice to deny coverage and file a declaratory judgment action seeking a judgment that there is no duty to defend.

124.    Morris also falsely asserted that the "clear and incontrovertible facts" were that Michele Hill did not have T&J Enterprises' permission to drive the tow truck, and that such facts precluded any possibility that T&J Enterprises may be liable for the claimants' injuries. Morris did not conduct anywhere near a thorough enough factual investigation to make such an assertion, and he consciously disregarded the information NARS obtained from Michele Hill that controverts Morris's version of the facts.

125.    Moreover, by making this assertion concerning the facts Morris believed to be pertinent to liability and coverage *to the claimants' attorney*, Morris was, to the detriment of his client AmGUARD, effectively inviting the claimants' attorney and the insureds' attorney to focus on developing facts (and controverting those asserted by Morris) that would most clearly trigger coverage under the AmGUARD Policy.

126.    By communicating, on behalf of AmGUARD, that there was no coverage for the claim against T&J Enterprises, Morris had, yet again, on behalf of AmGUARD unjustifiably denied coverage and refused to defend, such that AmGUARD would be "treated as if it waived any control of the underlying tort action." Moreover, the unjustifiable denial of coverage recommended and carried out by Morris amounted to bad faith attributable to AmGUARD.

127.    Similarly, by rejecting the opportunity to settle the claim against the insured T&J Enterprises within the policy limit based on an egregiously erroneous coverage decision (which in

35

#34518152 v1

turn was based on an incomplete and woefully incorrect factual and legal analysis), Morris recommended and carried out actions on behalf of AmGUARD that were evidence of bad faith refusal to settle.

128.    Relatedly, by rejecting the opportunity to settle the claim against the insured T&J Enterprises within the policy limit based on an incomplete investigation and legal analysis of liability, Morris recommended and carried out actions on behalf of AmGUARD that were evidence of bad faith refusal to settle.

*__Morris's Failures Concerning the Second Amended Petition and the Amended Declaratory Judgment Complaint__*

129.    On March 1, 2021, a second amended petition was filed in the Jefferson County Lawsuit. A copy of that pleading is attached hereto as Exhibit 5.

130.    The second amended petition included new causes of action and new allegations against T&J Enterprises.

131.    Morris failed to analyze the allegations in the second amended petition, failed to advise whether any of the new allegations affected the coverage analysis, failed to advise whether an updated reservation of rights letter needed to be sent in light of the new allegations, and failed to advise whether the new allegations would call for AmGUARD to dismiss the declaratory judgment action, rescind the denial of coverage, and offer the policy limit.

132.    On March 22, 2021, Morris filed an amended complaint in the Declaratory Judgment Action. A copy of that pleading is attached hereto as Exhibit 6.

133.    However, the only substantive difference between the original complaint and the amended complaint is that the amended complaint adds two new defendants (Earl Hill and

36

Brandon Pyrtle, who had been added as defendants in the second amended petition in the Jefferson County Lawsuit).[1]

134.    As the amended complaint was materially identical to the original complaint, it suffered from the same deficiencies described in paragraphs 103-112, *supra*.

135.    Additionally, the amended complaint filed by Morris did not mention the Jefferson County Lawsuit's second amended petition or any of the new allegations asserted therein. Moreover, Morris attached the ***first*** amended petition from the Jefferson County Lawsuit (which at that time was an abandoned pleading) as an exhibit to his amended complaint.

136.    By filing the amended complaint for declaratory judgment – which sought a judgment ordering that AmGUARD had no duty to defend or indemnify T&J Enterprises – Morris had, yet again, on behalf of AmGUARD unjustifiably denied coverage and refused to defend, such that AmGUARD would be "treated as if it waived any control of the underlying tort action." Moreover, the unjustifiable denial of coverage recommended and carried out by Morris amounted to bad faith attributable to AmGUARD.

### Morris's Failure to Advise AmGUARD about the Section 537.065 Agreement

137.    In a letter dated August 30, 2021, T&J Enterprises' personal counsel sent a letter to Morris advising that his clients had entered into a Section 537.065 agreement with the claimants.

138.    Morris reviewed this letter on September 1, 2021, but failed to report this development to AmGUARD and did not mention it to anyone until NARS (who also received the letter) asked Morris about it on September 14, 2021.

---

[1] The amended complaint for declaratory judgment also included different allegations pertaining to citizenship of the parties and the Declaratory Judgment Act, seemingly in response to admonition from the court for the need to properly allege the court's jurisdiction.

139.   In response to NARS notifying Morris it had received that letter, Morris responded, "I am evaluating how to respond / proceed and will advise you both as soon as possible." Morris proceeded to not correspond with NARS, AmGUARD, or anyone else about this development until November 4, 2021.

140.   Morris should have immediately advised that a Section 537.065 agreement meant that the insureds and plaintiffs were likely working together to obtain an inflated judgment based on facts tailored to fall within the coverage of the AmGUARD Policy, with the end result being equitable garnishment and bad faith claims against AmGUARD that AmGUARD would have great difficulty defending. Instead, Morris failed to advise AmGUARD of anything.

141.   Morris should have immediately sought to have AmGUARD intervene in the underlying tort action, and then he would have discovered that that action had been dismissed without prejudice (which occurred on August 27, 2021); he should have taken efforts to monitor Missouri Case.Net for the refiling of suit so that AmGUARD could attempt to intervene and protect its interests. Instead, Morris failed to even attempt to do so.

142.   Morris also should have taken steps to expedite the declaratory judgment action to get resolution of the coverage issue there rather than in an equitable garnishment action. Instead, Morris failed to timely pursue the Declaratory Judgment Action and file dispositive motions.

143.   Morris did nothing in response to this development, which should have clearly alerted him that efforts were being made to expose his client AmGUARD to multimillion-dollar liability.

### *Morris's Incorrect Advice Regarding the Section 537.065 Agreement, the Dismissal of the Jefferson County Lawsuit, and the Insureds' Request for Claim File and Privilege Waiver*

144.   On November 4, 2021, NARS advised Morris that T&J Enterprises had requested any claim file and legal file assembled by AmGUARD or counsel retained by AmGUARD to

defend T&J Enterprises. NARS also asked that Morris respond to the prior inquiry concerning the Section 537.065 notification letter.

145.    Morris's response that day was that he was still researching the statute, which, according to Morris, had been amended in 2018. (The statute was actually amended in 2017 and 2021). Morris again failed to provide the advice concerning the statute that he should have been immediately able to provide, set forth in paragraphs 140-142 *supra*.

146.    Morris also failed to make any comment or provide any advice with respect to the development that the insureds were requesting the claim file and defense attorneys' files. This, in conjunction with the notification about the Section 537.065 agreement, should have alerted Morris that the insureds were likely going to search through the claim file for evidence that would later be used against AmGUARD in extra-contractual litigation. Morris failed to give AmGUARD or NARS any warning about this and failed to recommend any steps be taken to protect against an extracontractual claim.

147.    On December 7, 2021, Morris sent an email to NARS, advising NARS that he had learned from discussions with the claimants' attorney that the Jefferson County Lawsuit had been dismissed without prejudice.

148.    Morris again failed to advise what the significance of this development (which he should have discovered months earlier) was and failed to recommend that his office constantly monitor Case.Net for the filing of a new lawsuit (either a new tort lawsuit or an action to confirm an arbitration award).

149.    Morris then finally provided a response to NARS with respect to the Section 537.065 agreement, advising that he had requested a copy of the agreement from the attorneys for the claimants and the insureds.

#34518152 v1

150.    Morris stated that the statute requires that the insurer be provided with a copy of the agreement. However, Morris failed to differentiate between the 2017 version of the statute (which only requires that the insured provide the insurer notice that a non-execution agreement has been entered) and the 2021 version (which requires a copy of the agreement be provided to the insurer), and he failed to provide any explanation or analysis as to which version of the statute applied.

151.    Morris then suggested that the agreement could void coverage under the AmGUARD Policy "even though there was no coverage under the facts." In addition to repeating his inaccurate conclusion about the applicability of coverage for T&J Enterprises, Morris failed to provide an analysis concerning the cooperation conditions of the AmGUARD Policy and whether the insured is still bound to those provisions after the insurance company breaches the AmGUARD Policy by denying coverage, which it was not.

152.    Morris also failed to report that he had been asked by the claimants' attorney Grayson whether he would comply with the insureds' request to provide the claim file and defense attorney's legal file. The fact that the *claimants*' attorney was asking whether AmGUARD would comply with the *insureds'* request for the claim file should have alerted Morris that there was cooperation between the claimants and the insureds which would be aimed to the detriment of the insurer. Morris apparently failed to realize this, and he certainly failed to alert NARS or AmGUARD to the situation.

153.    On December 14, 2021, Morris became aware that T&J Enterprises had waived any privilege applicable to communications between itself and AmGUARD. In the declaratory judgment action, the claimants had filed reply suggestions in support of their motion to compel against AmGUARD which referenced a "Release and Waiver of Insurer-Insured and Attorney-

40

Client Privilege" executed by T&J Enterprises. That file-stamped document was sent to Morris through the federal court's electronic filing system.

154.    This development should have alerted Morris to the fact of cooperation between the insureds and the claimants and should have been an impetus for Morris to take additional measures to protect AmGUARD's interests, most particularly the constant monitoring of Case.Net for any new lawsuit filed by the claimants with respect to the accident. Instead, Morris did nothing proactive after being notified of the insureds' waiver of privilege. Moreover, Morris did not report this development to AmGUARD or NARS.

155.    On December 30, 2021, the claimants' attorney responded to Morris's request for the 537.065 agreement by advising that the 2017 version of the statute applied to the agreement because it was entered into prior to August 28, 2021, and that the 2017 statute only required notice of an agreement, not production of the agreement itself. Again, Morris failed to provide AmGUARD or NARS any notice of these communications, nor did he ever conduct any sort of analysis as to which version of the statute applied.

156.    On August 24, 2022, Morris emailed AmGUARD to advise that his original recommendation was to file a declaratory judgment action "and simultaneously defend the insureds to prevent an agreement under RSMo. 537.065 that could lead to an excess judgment should the carrier fail to defend and not be aware of the agreement." Morris once again failed to recognize or mention the Missouri case law holding that filing a declaratory judgment action, in and of itself, constitutes a refusal to defend.

157.    Morris also failed to advise that it was the act of denying coverage/filing a declaratory judgment action that allowed the Section 537.065 agreement process to begin.

#34518152 v1

158.    Morris never provided AmGUARD or NARS a legal analysis regarding the Section 537.065 agreement or its implications on the matter, despite having been requested to do so.

***The Jackson County Lawsuit***

159.    On April 4, 2022, Deborah Moses and M.M. filed suit against T&J Enterprises in the Circuit Court of Jackson County, Missouri, bearing case number 2216-CV07062 (the "Jackson County Lawsuit"). A copy of the petition filed in the Jackson County Lawsuit is attached hereto as Exhibit 7.

160.    The petition filed in the Jackson County Lawsuit alleged materially the same claims, allegations, and causes of action as the second amended petition in the Jefferson County Lawsuit.

161.    On July 18, 2022, a bench trial took place in the Jackson County Lawsuit.

162.    On August 5, 2022, judgment was entered in the Jackson County Lawsuit. A copy of the judgment is attached hereto as Exhibit 8.

163.    The judgment includes findings of fact that are materially the same as what was alleged in the Jackson County Lawsuit's petition (which are materially the same as what was alleged in Jefferson County Lawsuit's second amended petition). The judgment awarded the claimants $18,602,024.88 for their action against T&J Enterprises.

164.    On September 27, 2022, an amended judgment was entered in the Jackson County Lawsuit, which was the same as the original judgment except that the amended judgment also awarded the claimants post-judgment interest. A copy of the amended judgment is attached hereto as Exhibit 9.

165.    Morris failed to monitor Case.Net for any filing of lawsuit against the AmGUARD insured and missed the filing of the Jackson County Lawsuit, failed to attempt to intervene in that

42

#34518152 v1

lawsuit, and/or failed to notify AmGUARD or NARS of that lawsuit or the judgment entered therein, until after the judgment had become final.

***Additional Professional Negligence Committed by Morris and Gordon Rees***

166.    From the time that Morris filed the Declaratory Judgment Action in December 2020 through the termination of Morris' and Gordon Rees' representation of AmGUARD in January 2023, Morris committed a multitude of errors and omissions, including, but not limited to: (a) suggesting to AmGUARD that defense counsel in the Jefferson County Lawsuit would be able to obtain a stay of that lawsuit while the Declaratory Judgment Action played out; (b) failing to correctly list all parent companies of AmGUARD in the Disclosure of Organizational Interests filed in the Declaratory Judgment Action; (c) failing to advise AmGUARD or NARS of the demand made by T&J Enterprises' counsel that AmGUARD provide independent counsel for T&J Enterprises in the Declaratory Judgment Action; (d) making legally incorrect arguments in response to a motion to dismiss the Declaratory Judgment Action; (e) failing to advise AmGUARD or NARS of the motion to dismiss the Declaratory Judgment Action; (f) failing to accurately advise NARS and AmGUARD who the directors of T&J Enterprises were; (g) failing to follow local court rules regarding redaction of minors' identifying information and the names of parties in pleading captions; (h) failing to state the correct date in a certificate of service; (i) arguing in suggestions responding to another motion to dismiss the Declaratory Judgment Action that it did not matter what had been alleged in the Jefferson County Lawsuit; (j) failing to report to AmGUARD that a second motion to dismiss the Declaratory Judgment Action – in which the claimants' counsel specifically argued that new allegations in the Jefferson County Lawsuit's second amended petition triggered coverage under the AmGUARD Policy's CGL and commercial auto coverages – had been filed and failing to properly consider the arguments made therein; (k) failing to file a joint

43

scheduling plan in the Declaratory Judgment Action within the timeframe required by the court; (l) failing to confer with opposing counsel regarding a joint scheduling plan prior to the deadline; (m) failing to monitor development of the Jefferson County Lawsuit and request a copy of deposition transcripts from that case; (n) failing to investigate whether other insurance policies (such as Michele Hill's personal auto policy) would afford coverage for the accident; (o) failing to timely advise AmGUARD or NARS of the death of Jeffrey Pyrtle and what impact that may have on evidentiary issues concerning the recorded statement and ability to present evidence consistent with that statement; (p) failing to file motions for default against the Hills in the Declaratory Judgment Action within the timeframe required by the court; (q) producing the recorded statement of Jeffrey Pyrtle to the claimants' attorney, thereby violating the insurer-insured privilege;[2] (r) failing to advise AmGUARD or NARS that he had disclosed the statement, or that claimants' counsel was accusing him of setting AmGUARD up for a bad faith case; (s) identifying the deceased Jeffrey Pyrtle in Rule 26 disclosures as a person likely to have discoverable information that AmGUARD would use to support its claims; (t) identifying the recorded statement of Jeff Pyrtle in Rule 26 disclosures as evidence AmGUARD may use to support its claims; (u) failing to provide a privilege log along with objections to discovery; (v) including typos and nonsensical sentences in the suggestions opposing a motion to compel; (w) failing to advise AmGUARD that the court ruled that its claim file was discoverable; (x) failing to have requested a copy of the claim file when it was originally sought in written discovery; (y) failing to timely respond to written

---

[2] Claimants' counsel responded by advising Morris, "You do understand this is not admissible evidence, and you setting [sic] your client up for a bad faith case." Morris responded:

> What are you talking about? I won't need to use this statement as evidence, first of all. However, I took the statement, and it is discoverable, so we are producing it to you. I'm sure I know more about Missouri Bad Faith law than you, so concentrate on advising your own clients rather than opposing counsel.

#34518152 v1

discovery requests; (z) failing to locate (or even attempt to locate) a new contact at AmGUARD after his prior contact left the company; (aa) making nonsensical objections to written discovery requests; (bb) failing to confer with AmGUARD or NARS regarding written discovery requests; (cc) failing to request that AmGUARD provide a sworn signature for interrogatory answers; (dd) failing to participate with other parties in the preparation of an amended scheduling order as required by the court; (ee) failing to provide AmGUARD or NARS any status updates from March 23, 2022 to August 22, 2022, despite multiple requests for status updates during that time; (ff) falsely advising NARS that he had served written discovery on all of the defendants in the Declaratory Judgment Action; (gg) failing to timely propound interrogatories or requests for production on the defendants; (hh) failing to move to compel substantive responses to requests for admissions from T&J Enterprises; (ii) failing to depose any person or party in the Declaratory Judgment Action; (jj) erroneously assuring NARS that the recorded statement of Jeff Pyrtle could support a motion for summary judgment; (kk) advising NARS that a summary judgment motion would be prepared based on erroneous legal arguments; (ll) failing to prepare any substantive part of the summary judgment motion while advising NARS that said motion would be on file in short order; (mm) failing to send any email or correspondence to anyone at AmGUARD for several months; (nn) falsely advising AmGUARD that most of the discovery necessary to support a motion for summary judgment had been completed; (oo) failing to advise AmGUARD of the dangers associated with Section 537.065 agreements; (pp) falsely indicating to AmGUARD that he had been reaching out to AmGUARD for guidance as to whether his firm is being requested to continue handling this matter but had heard nothing back; (qq) failing to contact mediators by the deadline for submitting a Designation of Neutral with the court; (rr) failing to timely file the Designation of Neutral; (ss) failing to file a Designation of Neutral within the second deadline set by the court;

45

(tt) failing to timely file a request for extension of time to file a Designation of Neutral with the court; (uu) falsely representing in the motion for extension of time that he had difficulty communicating with AmGUARD for months; (vv) failing to notify AmGUARD or NARS about the mediation order until 10 days prior to the deadline for completing mediation; (ww) scheduling the mediation date without conferring with AmGUARD or NARS for their availability; (xx) repeating the same incorrect coverage arguments described above in a statement to the mediator; (yy) failing to notify AmGUARD that the claimants had noticed up depositions for AmGUARD's corporate representative and AmGUARD employees; (zz) failing to object to or move to quash topics requested in the notice for AmGUARD's corporate representative deposition; (aaa) failing to timely object to or move to quash NARS depositions;  (bbb) failing to attempt to timely locate a corporate representative from AmGUARD; (ccc) failing to confer with anyone at AmGUARD about corporate representative deposition availability; (ddd) incorrectly advising NARS that there was not a notice of deposition for a NARS corporate representative; (eee) falsely advising NARS that he would deal directly with AmGUARD for finding a corporate representative; (fff) failing to advise AmGUARD or NARS about an *in camera* hearing regarding the claim files; (ggg) failing to respond to the claimants' attorney's request for dates on which an AmGUARD corporate representative could be deposed; (hhh) falsely advising claimants' counsel that he still could not get in contact with anyone at AmGUARD for a corporate representative deposition; (iii) failing to advise AmGUARD of the claimants' counsel's request for corporate representative deposition dates; (jjj) incorrectly advising claimants' counsel that he did not represent NARS and suggesting that a subpoena be served on NARS to obtain its deposition; (kkk) falsely telling AmGUARD and NARS that he had previously advised each of the notice of the AmGUARD corporate representative deposition; (lll) failing to timely produce documents following the *in camera*

46

hearing; (mmm) advising AmGUARD that he had been unable to reach anyone at AmGUARD about the corporate representative deposition, despite having made no attempts to do so; (nnn) advising AmGUARD that he would confer with claimants' counsel regarding the scope of deposition topics but then failing to do so; (ooo) failing to timely confer with AmGUARD regarding new deposition dates proposed by claimants' counsel; (ppp) advising AmGUARD that he would file a motion to quash the deposition and object to the deposition topics, but then failing to do so; (qqq) failing to provide documents requested by the AmGUARD employee who initially was planned to serve as corporate representative; (rrr) failing to advise AmGUARD or NARS that amended notices of corporate representative depositions had been served; (sss) failing to timely advise AmGUARD of the new date for the corporate representative deposition, resulting in the AmGUARD employee initially lined up to serve as corporate representative no longer being available to do so; (ttt) falsely advising AmGUARD that the corporate representative deposition would not be complicated and was not relevant to the claim, that he had fought having to present a witness, that AmGUARD "simply need[ed] a warm body to appear via Zoom for the deposition," and that he could "prepare the witness adequately in an hour;" (uuu) failing to adequately prepare AmGUARD's corporate representative for the deposition; (vvv) failing to timely communicate with NARS regarding preparation for the corporate representative deposition; (www) providing incomplete, insufficient, inaccurate, and otherwise deficient commentary to AmGUARD with respect to each of the topics in the corporate representative deposition notice less than 24 hours prior to the deposition; (xxx) failing to provide AmGUARD's new coverage counsel with the entirety of the client's file; and (yyy) failing to timely conduct sufficient discovery in the Declaratory Judgment Action.

#34518152 v1

167.    These errors and omissions contributed to the cause of the alleged bad faith liability exposure and other damage suffered by AmGUARD.

**_Equitable Garnishment and Bad Faith Claims_**

168.    On February 13, 2023, claimants Deborah Moses and M.M. filed a petition for equitable garnishment against AmGUARD and T&J Enterprises in the Circuit Court of Cole County, Missouri, bearing case number 23AC-CC00787 (the "Equitable Garnishment Lawsuit"). A copy of the petition filed in the Equitable Garnishment Lawsuit is attached hereto as Exhibit 10.

169.    The petition filed in the Equitable Garnishment Lawsuit alleged that the AmGUARD Policy provides coverage for the judgment entered in the Jackson County Lawsuit, and that AmGUARD improperly denied coverage for the claims arising out of the accident.

170.    The petition further alleged that AmGUARD is collaterally estopped from challenging the judgment in the Jackson County Lawsuit due to AmGUARD's denial of coverage for the claims asserted therein.

171.    The petition in the Equitable Garnishment Lawsuit sought a judgment against AmGUARD for the policy limits of coverage, plus interest and costs.

172.    On July 26, 2023, T&J Enterprises filed a crossclaim against AmGUARD in the Equitable Garnishment Lawsuit. A copy of the crossclaim is attached hereto as Exhibit 11.

173.    The crossclaim alleges that the claims and judgment against T&J Enterprises in the Jackson County Lawsuit were the same claims originally brought in the Jefferson County Lawsuit, and that all such claims were covered by the AmGUARD Policy.

174.    The crossclaim then alleges a cause of action for bad faith refusal to defend, in which it was alleged that AmGUARD improperly denied coverage to T&J Enterprises and acted

48

in bad faith by doing so. T&J Enterprises sought damages in the amount of the $18.6 million judgment, plus attorneys' fees and punitive damages.

175.    The crossclaim also alleged a cause of action for bad faith refusal to settle, in which it was alleged that AmGUARD had opportunities to settle the claims against T&J Enterprises within the limit of the AmGUARD Policy, but in bad faith failed to do so. T&J Enterprises sought damages in the amount of the $18.6 million judgment, plus attorneys' fees and punitive damages.

176.    The crossclaim also asserted claims of breach of fiduciary duty, breach of contract, and negligence against AmGUARD, all arising out of the denial of coverage and failure to resolve the claim within policy limits. These causes of action also sought damages in the amount of the $18.6 million judgment, plus attorneys' fees and punitive damages.

177.    The allegations in the Equitable Garnishment Lawsuit that the AmGUARD Policy provided coverage for the claims against T&J Enterprises, that AmGUARD (through the actions recommended and carried out by Morris) denied coverage in bad faith, and that AmGUARD (through the actions recommended and carried out by Morris) rejected the policy limit demand in bad faith, were all true and accurate as the proximate result of the professional negligence of Morris and Gordon Rees.

178.    To mitigate its damage resulting from the professional malpractice of Morris and Gordon Rees, AmGUARD settled the equitable garnishment, and bad faith claims for a confidential amount in excess of $75,000.00.

179.    Settlement of the claims asserted in the Equitable Garnishment Lawsuit was necessary to mitigate AmGUARD's damages, which would have exceeded $20,000,000 had those claims gone to trial.

49

#34518152 v1

180. If AmGUARD had not settled the claims asserted in the Equitable Garnishment Lawsuit, AmGUARD would have been worse off, as the conduct of Morris and Gordon Rees on behalf of AmGUARD would have been held to be attributable to AmGUARD under Missouri law of principal/agency and potential evidence of bad faith and would have justified compensatory damages in the full amount of the $18.6 million Jackson County Lawsuit judgment, plus millions in punitive damages and attorneys' fees.

181. Morris and Gordon Rees were invited to the negotiations which resulted in the settlement, but they declined to participate.

182. Each of the acts and omissions on the part of Morris and Gordon Rees described above were failures to use the degree of skill and diligence that a reasonably competent lawyer would use in similar circumstances, thereby constituting negligence and professional malpractice.

183. As the direct and proximate result of said negligence and professional malpractice, AmGUARD has been damaged by the professional negligence of Morris and Gordon Rees in the amount of the confidential settlement amount, plus attorneys' fees incurred while defending the claims asserted in the Equitable Garnishment Lawsuit, plus additional attorneys' fees incurred, plus pre-judgment interest, post-judgment interest, and costs.

**WHEREFORE**, Plaintiff AmGUARD Insurance Company prays that the Court enters judgment in its favor in excess of $75,000.00, plus costs, attorneys' fees, pre-judgment interest and post-judgment interest, and grant any additional relief that the Court may deem just and proper under the circumstances. Plaintiff AmGUARD demands a trial by jury.

50

#34518152 v1

Respectfully submitted,

**WATTERS WOLF BUB HANSMANN LLC**

/s/ *Russell F. Watters*
Russell F. Watters, #25758(MO)
Bradley R. Hansmann, #53160(MO)
Joseph P. Krispin, #69181(MO)
600 Kellwood Parkway, Suite 120
St. Louis, Missouri 63017
(636) 798-0570 – Telephone
(636) 798-0693 - Facsimile
rwatters@wwbhlaw.com
bhansmann@wwbhlaw.com
jkrispin@wwbhlaw.com
*Attorneys for Plaintiff AmGUARD*

51

#34518152 v1